*In the matter of the petition of* SHERMAN M. BOOTH *for a writ of Habeas Corpus, and to be discharged from imprisonment ;*

*And in the matter of the petition of* JOHN RYCRAFT.

The Constitution of the State of Wisconsin vests in the Supreme Court of the State the power to issue, hear and determine the writ of Habeas Corpus, and to decide all the questions which legitimately arise therefrom ; and to release a citizen of the State, or one entitled to its protection, from illegal imprisonment. *Per Whiton, C. J.*

The power to protect the personal liberty of the citizen or subject is essential to the sovereignty which claims his allegiance. *Whiton, C. J.*

The State Courts which have the right and power to issue writs of Habeas Corpus, and to hear and determine the same, have necessarily the power to determine all the questions touching the legality of the alleged imprisonment, which may be presented by the petition and return, including that of the legal and constitutional authority by which such imprisonment is attempted to be justified. *Whiton, C. J.*

The District Courts of the United States have no common law jurisdiction in criminal cases, but such jurisdiction as they have, is conferred by act of Congress. *Whiton, C. J.*

The question of jurisdiction is a proper subject of inquiry whenever effect is to be given to the judgment of another court. *Whiton, C. J.*

The District Court of the U. S. for the District of Wisconsin is a court of special or limited jurisdiction. *Per Crawford, J.*

The District Courts of the U. S. are not inferior courts, in the technical sense of those words. *Crawford, J.*

But whether jurisdiction in regard to such courts should be presumed or not, if the record of their judgments or proceedings, coming collaterally under consideration, shows upon its face that the court has no jurisdiction in the premises, it should be disregarded.

In a criminal case in the District Court of the United States, where the indictment sets out no offence defined by act of Congress, such court obtains no jurisdiction, and a conviction thereon is void

When in a case in such court there are several counts in an indictment, some of which charge an offence defined by act of Congress, and others do not, and the defendant is convicted upon the latter, and acquitted upon the former, the jurisdiction of the court ceases and sentence is void. *Crawford, J.*

If upon the return of the writ of Habeas Corpus it appears that the cause of imprisonment be by process issued by the proper court having jurisdiction of the

subject matter, the prisoner should be remanded, otherwise discharged or left to bail, as the case may be. *Crawford, J.,*

The power to issue, hear and determine the writ of Habeas Corpus, is conferred by the Constitution of this State upon the Supreme and Circuit Courts, which power the Legislature can neither restrict nor impair. *Per Smith, J.*

The State and Federal Governments constitute a complex system, with powers distributed to each of its parts, but all of its parts together constituting an entire sovereignty. *Smith, J.*

The federal government is made up of delegated, the State governments of reserved powers. The duties of the former can only be co-extensive with the powers thus delegated, while those of the latter must remain commensurate with the powers reserved. The respective States and the people thereof were the source from which the federal government has derived all its powers, and remain sovereign and independent, only in so far as they have delegated or relinquished powers and attributes incident to complete sovereignty. *Smith, J.*

The power to guard and protect the liberty of the individual citizen is among the reserved powers of the States, never relinquished by them, except in cases specified in the Constitution of the United States. *Smith J.*

The jurisdiction of the writ of Habeas Corpus rightfully belongs to the respective States specially reserved, and the federal government is inhibited from suspending its privileges, except in case of rebellion or invasion. *Smith, J.*

Inferior courts of the United States are of special and limited jurisdiction, which is not to be presumed, but must affirmatively appear. *Smith, J.*

A record of conviction in the United States Court, which does not set out an offence defined by act of Congress, is void, and an imprisonment founded upon such conviction is illegal. *Smith, J.*

[These two applications are the same in all respects, and were made to the court January 26, 1855, during the December Term, and were then heard and determined. But, as their subject matter bears so close a relation to the two preceding cases decided at the June Term, it is deemed more convenient and appropriate to insert them here.]

On the 26th day of January, 1855, the following petition was presented in open court:

*To the Supreme Court of the State of Wisconsin, or to either of the Judges thereof:*

Your petitioner, John Rycraft, of the city and county of Milwaukee in said State of Wisconsin, re-

spectfully represents that he, the said John Rycraft,

is imprisoned and restrained in his liberty in the county jail of said Milwaukee county, by Samuel S. Conover, the sheriff of said county.

And your petitioner further represents, that he is not committed or detained by virtue of the final judgment or decree of any competent tribunal, of civil or criminal jurisdiction, or by virtue of any execution issued on such judgment or decree.

And your petitioner further states that the cause and pretence of said imprisonment and restraint of your petitioner, according to his best knowledge and belief, is, that he has been convicted under the act of Congress, commonly called "The Fugitive Slave Act," for " aiding, abetting and assisting" one Joshua Glover to escape from Charles C. Cotton, a deputy of S. V. R. Ableman, United States marshal for the district of Wisconsin ; and your petitioner hereunto annexes a transcript of the record of said pretended conviction, embracing a true copy of the warrant of commitment therein, marked " A," and which your petitioner prays may be taken as a part of this, his petition.

And your petitioner states that the transcript contains a copy of the indictment, and the record entries of the proceedings of the trial of your petitioner thereon, and of a pretended sentence pronounced upon your petitioner by the judge of the District Court of the United States for the district of Wisconsin ; and that said transcript is the only paper or warrant of commitment left with the jailor of said county by the marshal of the United States for said district of Wisconsin, who committed your petitioner to said jail, and delivered your petitioner to the keeper of

said jail; and that the said transcript is the only paper warrant of commitment, and pretended authority by or under which your petitioner is detained or imprisoned.

Your petitioner alleges that the said imprisonment and restraint are illegal, and that the said illegality consists in the fact that the act of Congress approved September 18, 1850, commonly called the Fugitive Slave Act, is unconstitutional and void; that said indictment, as is pretended, was framed under said act, and under that part and portion of the seventh section of said act of Congress, which prohibits the "aiding, abetting or assisting such person owing service or labor to escape," &c.

For which said reasons your petitioner alleges that the said District Court had no jurisdiction to try or punish your petitioner for the offence charged, or attempted to be charged upon your petitioner in the counts in said indictment, upon which your petitioner was convicted, as shown by said transcript.

And your petitioner further alleges that he has not, as he verily believes, been convicted of any offence, known to, specified, described, defined in, or created by said act of Congress, or of any offence or crime, known to, created by, or specified in any statute or law of the United States, and that said District Court had not any jurisdiction of said proceeding, of the said pretended offence charged in said indictment, nor of the person of your petitioner; alleges that said proceedings are null and void in law, and confer no right, power or authority whatever, on the said Conover, the U. S. Marshal, or any other person or persons, to restrain and imprison your petitioner; avers and claims, as hereinbefore set forth, that he is not committed or

detained by virtue of the final judgment or decree of any competent tribunal of civil or criminal jurisdiction ; because he says, that the District Court had no jurisdiction, and was not competent to try, hear, and determine said cause or to sentence your petitioner for the pretended offence set forth in said indictment, and in the said counts on which he was found guilty.

And your petitioner further states, that immediately upon the coming in of the verdict against him, his counsel filed a motion in arrest of judgment for reasons apparent upon the face of the record : which motion was duly argued and overruled by the said judge of said District Court.

And your petitioner further states, that the said Marshal of the U. S. committed your petitioner to jail, and he believes that it is claimed by the said Marshal and the said Judge, that your petitioner is still in the custody and under the control of the said Marshal.

Your petitioner therefore prays that a writ of Habeas Corpus may be issued and directed to the said Conover, and to the said Ableman, if the facts hereinbefore set forth shall authorize the same, commanding them and each of them, &c.

. Subscribed and duly sworn.

The transcript of the record of conviction annexed to the petition and made a part of it, sets out an indictment of the petitioner, which indictment is as follows :

"A."

UNITED STATES OF AMERICA.

*District Court of the United States for the District of Wisconsin, of the Term of January, in the year*

of our Lord one thousand eight hundred and fifty-five.

DISTRICT OF WISCONSIN, *ss*:

The jurors of the United States empanneled and sworn to enquire in and for the body of the district of Wisconsin, upon their oath present, that heretofore, to wit, on the ninth day of July, in the year of our Lord one thousand eight hundred and fifty-four, a certain warrant directed to the marshal of the said district of Wisconsin, was duly awarded and issued by the Honorable Andrew G. Miller, judge of the District Court of the United States for the said district of Wisconsin, for the apprehension of one Joshua Glover, which said warrant was duly delivered to Charles C. Cotton, Esquire, an officer of the United States, to wit, a deputy of the marshal of the United States for the said district of Wisconsin, at Milwaukee, in the district aforesaid, on the said ninth day of March, in the year aforesaid, and was of the purport and effect following, that is to say:

UNITED STATES OF AMERICA, } *ss*.
    *District of Wisconsin.* }

*The President of the United States of America to the Marshal of the District of Wisconsin, Greeting:*

Whereas, Benammi S. Garland hath [SEAL.] made affidavit before me, the judge of the District Court of the United States of America, for the district of Wisconsin, that one Joshua Glover, a negro man, owes him labor and service, according to the laws of Missouri, wherein he, the said affiant, lives and resides, and that he, the said Joshua Glover, ran away from said affiant, in the county of St. Louis, and State of Missouri, in the spring of one thousand eight hundred and fifty-two,

and that he, the said Joshua Glover, he believes is now in this State of Wisconsin. And said affiant further says, that at the time of his said running away, he, the said Joshua Glover, was and is now a slave for life, and owned by him, the said affiant; and as such slave did owe, and still does owe him, this affiant, labor and service, under and by virtue of the said laws of Missouri, from whence the said Joshua Glover escaped.

The said Joshua Glover is described in said affidavit to be forty-four or forty-five years of age, about five feet six or eight inches high, spare built, with rather long legs, very prominent knuckles, has large feet and hands, has a full head of wool, eyes small and inflamed, is of dissipated habits, is of rather an ashy black color.

These are, to command you the said marshal, to apprehend said fugitive, Joshua Glover, if to be found in your district, and bring him forthwith before me, at the city of Milwaukee, so that the matters alleged against him, may be inquired into according to law.

A. G. MILLER,
*Judge District Court of the United States*
*For the District of Wisconsin.*

And the Jurors aforesaid do further present, that the said warrant being duly awarded, issued and delivered as aforesaid, afterwards, to wit, on the eleventh day of March in the year aforesaid, at Milwaukee aforesaid, in the said district of Wisconsin, the said Charles C. Cotton, then and there being an officer of the said United States, to wit, a deputy of the marshal of the United States, for the district aforesaid, attempted to serve and execute the said warrant, in manner and form as he was therein commanded, and

that the aforesaid John Rycraft, late of Milwaukee in said district, with divers other persons to the said Jurors unknown, being then and there well and truly informed of the premises, then and there with force and arms, did knowingly, willfully and unlawfully obstruct, resist and oppose the said Charles C. Cotton, then and there being an officer of the said United States, as aforesaid, to wit, a deputy of the marshal of the United States for said district, in attempting as aforesaid, then and there to serve and execute the said warrant, in manner and form as he was therein commanded, to the great damage of the the said Charles C. Cotton, to the great hindrance and obstruction of justice, to the evil example of all others in the like case offending against the form of the Statute of the United States in such case made and provided, and against their peace and dignity.

And the Jurors aforesaid, upon their oath aforesaid, do further present, that on the eleventh day of March, in the year of our Lord one thousand eight hundred and fifty-four, at Milwaukee, in said district of Wisconsin, the said John Rycraft with force and arms, did knowingly and willfully obstruct, resist and oppose one Charles C. Cotton, a deputy of one Stephen V. R. Ableman, marshal of the United States, for the district of Wisconsin, and an officer of the United States, in serving and attempting to serve and execute a certain warrant and legal process, which before that time, to wit, on the ninth day of March, in the year last aforesaid, had been duly issued under the hand and seal of Andrew G. Miller, Judge of the District Court of the United States for the district of Wisconsin, and directed to the marshal of the said district of Wisconsin, which the said Charles C. Cot-

ton, in due and lawful execution of his said office, had then and there in his hands and possession, for service of the same, and which he was then and there serving, and attempting to serve and execute; which said warrant commanded the said Charles C. Cotton to apprehend one Joshua Glover, and have him forthwith before the said Judge, that the matters alleged against him might be inquired into according to law; against the form of the Statute of the United States in such case made and provided, and against their peace and dignity.

And the Jurors aforesaid, upon their oath aforesaid, do further present, that on the eleventh day of October, in the year of our Lord one thousand eight hundred and fifty-four, at Milwaukee, in the district of Wisconsin aforesaid, the aforesaid John Rycraft with force and arms, did knowingly and willfully obstruct, resist and oppose one Charles C. Cotton, a deputy of Stephen V. R. Ableman, marshal of the United States, for the said district of Wisconsin, and an officer of the said United States, in serving and attempting to serve and execute a certain legal process, which before that time, to wit, on the ninth day of March, in the year last aforesaid, had been duly issued by Andrew G. Miller, judge of the District Court of the United States, for the district of Wisconsin, and duly delivered for execution to the said Charles C. Cotton, wherein and whereby, and in pursuance of the command whereof, the said Cotton was then and there lawfully retaining, detaining and holding in custody one Joshua Glover, for the further hearing and determination of a certain complaint, upon which a warrant before that time, to wit, on the said ninth day of March, in the year last aforesaid, had been duly

issued under the hand and seal of Andrew G. Miller, judge as aforesaid ; by force of which said warrant, the said Joshua Glover had been duly arrested, and apprehended by the said Cotton, and in execution of the same, on the said eleventh day of March, had been brought by said. Cotton, and committed to the common jail of the county of Milwaukee, in the dis- trict aforesaid ; Against the peace and dignity of the said United States, and contrary to the form of the Statute in such case made and provided.

And the jurors aforesaid upon their oath aforesaid do further present that the said John Rycraft, late of Milwaukee in the district of Wisconsin aforesaid, on the eleventh day of March, in the year one thou- sand eight hundred and fifty-four, at the said city of Milwaukee, in the said district of Wisconsin, with force and arms, did knowingly and willingly aid, abet and assist one Joshua Glover to escape from the cus- tody of Charles C. Cotton, then and there being a deputy marshal of the United States for the district of Wisconsin ; he, the said Joshua Glover, having been theretofore apprehended by, and then and there being in the custody of the said Charles C. Cotton as such deputy Marshal of the United States for the district as aforesaid, by virtue of and in obedience to a certain warrant theretofore issued by Andrew G. Miller, then and there being the judge of the District Court of the United States, for the said district of Wisconsin, which the said warrant is in the words and figures following, that is to say :

UNITED STATES OF AMERICA, ⎱ *ss.*
     *District of Wisconsin.* ⎰

*The President of the United States of America, to the Marshal of the District of Wisconsin, Greeting:*

WHEREAS, Benammi S. Garland hath <sup>June Term</sup> <sup>1854.</sup>
[SEAL]   made affidavit before me the judge of the
District Court of the United States of In re Booth and Rycraft.
America for the district of Wisconsin, that one Joshua
Glover, a negro man, owes him labor and service ac-
cording to the laws of Missouri, wherein he, the said
affiant, lives and resides, and that he, the said Joshua
Glover, ran away from the said affiant in the county
of St. Louis and State of Missouri, in the spring of
one thousand eight hundred and fifty-two ; and that
he, the said Joshua Glover, he believes is now in the
State of Wisconsin. And said affiant further says
that at the time of his said running away, he, the
said Joshua Glover was and is now a slave for life
and owned by him, the said affiant, and as such slave
did owe and still does owe him, this affiant, labor and
service under and by virtue of the said laws of Mis-
souri, from whence the said Joshua Glover escaped.
The said Joshua Glover is described in said affidavit
to be forty-four or forty-five years of age, about five
feet six or eight inches high, spare built with rather
long legs, very prominent knuckles, has large feet and
hands, has a full head of wool, eyes small and in-
flamed, is of dissipated habits, is of rather an ashy
black color. These are therefore to command you,
the said marshal, to apprehend said fugitive, Joshua
Glover, if to be found in your district, and bring him
forthwith before me, that the matter alleged against
him may be inquired into according to law.

In witness whereof, I have hereunto set my hand
and seal at Milwaukee, in the district aforesaid this
9th day of March, A. D. 1854.   A. G. MILLER,
*Judge District Court of the United States*
*for the District of Wisconsin.*

Against the form of the statute of the United States in such case made and provided, and against their peace and dignity.

And the jurors aforesaid, upon their oath aforesaid do further present, that on the ninth day of March in the year one thousand eight hundred and fifty-four, one Benammi S. Garland appeared before Andrew G. Miller, then and there being the judge of the District Court of the United States for the district of Wisconsin, at the city of Milwaukee in the said district of Wisconsin, and then and there made oath in writing before the said Andrew G. Miller as such judge as aforesaid, that he resided near the city of St. Louis in the State of Missouri, that Joshua Glover, a negro, had been and then was held to service and labor to him, the said Benammi S. Garland as a slave in the said State of Missouri, and then still owed service and labor to him, the said Benammi S. Garland, as such slave. That the said Joshua ran away from the said Benammi S. Garland in the county of St. Louis in the State of Missouri, in the spring of 1852. That he, the said Benammi S. Garland, had ascertained and verily believed that the said Joshua then was in the State of Wisconsin at or near the city of Racine. That at the time of the running away and escape of said Joshua he was a slave for life and under and by virtue of the laws of the State of Missouri, was the slave of him, the said Benammi S. Garland, and was then such slave, and had owed and then still owed labor and service under and by virtue of said laws, to him the said Benammi S. Garland, that said Joshua then was about forty-four or forty-five years of age, about five feet, six or eight inches high, spare built, with rather long legs, very prominent knuckles, had

large feet and hands, had a full head of wool, eyes
small and inflamed, was of dissipated habits, was of
rather an ashy black color, had one of his shoulders
stiff from dislocation and had stooping shoulders, and
a slow gait. That he, the said Benammi S. Garland,
purchased said Joshua as a slave for life in the State
of Missouri and under and by virtue of the laws of
said State, on the first day of January, A. D., 1849,
and had never alienated his title to said slave nor re-
leased him from the labor and service so due to him
as aforesaid. That the said Benammi S. Garland was
a farmer and carried on a farm about four miles from
said city of St. Louis. That he had used and employ-
ed said Joshua as foreman on his said farm from the
time of said purchase to the time of the escape of said
Joshua as aforesaid. That he had seen the said Josh-
ua daily, knew him well and could at sight identify
him with certainty. That the said Joshua had been
and was of great value to him the said Benammi S.
Garland, as his slave for life, and on account of the
labor and services of the said Joshua so due to him
as aforesaid; and the Jurors aforesaid, do further pre-
sent that thereupon the said Andrew G. Miller then
and there being such judge as aforesaid, afterwards,
to-wit: on the same day and year and at the place last
aforesaid, issued a certain warrant under his hand and
seal, bearing date the day and year last aforesaid,
and directed in the name of the President of the Uni-
ted States of America, to the Marshal of the said dis-
trict of Wisconsin, reciting, that, whereas, the said
Benammi S. Garland had made affidavit before him,
the said Andrew G. Miller, the Judge of the District
Court of the United States of America for the district
of Wisconsin, that one Joshua Glover, a negro man

owed him, the said Benammi S. Garland, labor and service according to the laws of Missouri, wherein he, the said affiant, Benammi S. Garland then lived and resided, and that he, the said Joshua Glover, had run away from him, the said affiant, in the county of St. Louis, and State of Missouri, in the spring of one thousand eight hundred and fifty-two, and that he, the said Joshua Glover, he, the said Benammi S. Garland, believed was then in the State of Wisconsin, and the said affiant further said that at the time of his said running away, he the said Joshua Glover, had been and then was a slave for life, and owned by him the said affiant, and as such slave had owed, and then still did owe him the said affiant, labor and service, under and by virtue of the said laws of Missouri, from whence the said Joshua Glover escaped. The said Joshua Glover was described in said affidavit, to be forty-four or forty-five years of age, about five feet six or eight inches high, spare built with rather long legs, very prominent knuckles, had large feet and hands, had a full head of wool, eyes small and inflamed, was of dissipated habits, was of rather an ashy black color; and therefore commanding him, the said Marshal, to apprehend the said fugitive Joshua Glover, if to be found in his, the said Marshal's District, and bring him forthwith before him, the said Andrew G. Miller, judge of the District Court of the United States, for the district of Wisconsin, at the City of Milwaukee, so that the matters alleged against him, might be inquired into according to law; which said warrant was afterwards, to-wit, on the day and year last aforesaid, at the place last aforesaid, delivered to Charles C. Cotton, then and there being a Deputy Marshal of the United States, for the said district of

Wisconsin, to be by him executed, and that the said
Charles C. Cotton, then and there being such Deputy
Marshal as aforesaid, afterwards, to-wit, on the
eleventh day of March, in the year last aforesaid, at
the place last aforesaid, by virtue of and in obedience
to the said warrant, apprehended the said Joshua Glo-
ver, in the said warrant named, and then and there
held him, the said Joshua Glover, in custody. And
the Jurors aforesaid do further present, that the said
John Rycraft of Milwaukee, afterwards, to-wit, on the
day and year last aforesaid, and at the place last afore-
said, with force and arms did unlawfully, knowingly,
willingly, aid, abet and assist the said Joshua Glover
to escape from the said custody of the said Charles
C. Cotton, against the form of the Statute of the Uni-
ted States in such case made and provided, and against
the peace and dignity of the United States.

The record further shows that at a special term of
the District Court of the U. S. for the District of
Wisconsin, in November 1854, the defendant charged
in the indictment, having been arrested, moved the
court by his counsel to quash the indictment for in-
sufficiency ; which motion was overruled : whereupon
on being arraigned and required to plead to the said
indictment, did plead not guilty. At the same term
of November, 1854, the cause came on to be tried upon
the issue so joined, and having been submitted to the
jury, they returned the following verdict viz : " That
the defendant John Rycraft is guilty in manner and
form as he stands indicted in the *second* and *third*
counts in this indictment."

It further appears by the record that the defend-
ant by his counsel moved the said District Court
in arrest of judgment, and also for a new trial, which

motions were held under advisement until the 23d day of January 1855, at the January term of said court, when the following proceedings were had,—— "This day the court being sufficiently advised of and concerning the motions of this defendant, for a new trial and in arrest of judgment, doth order that they be and hereby are overruled, whereupon the court doth sentence John Ryecraft that he be imprisoned for the term of ten days in the jail of Milwaukee County, and in such other prisons or places as the court or judge thereof may from time to time direct, and that he pay a fine of two hundred dollars, and that he be and remain in custody until this sentence be complied with."

January 23d, 1855.

Upon the foregoing application, the Supreme Court directed a writ of Habeas Corpus to issue, according to the prayer of the petitioner, which was issued accordingly on the 27th day of January, 1855. On the 30th day of January, the writ directed to the sheriff of Milwaukee county was returned by him with the body of the petitioner, as follows:

"I, Samuel S. Conover, the person named in the within writ, and to whom the same is directed, do return that said writ was duly served on me on the 27th day of January, 1855, as required by law, and that a bond was given and fees paid, as required by the statute: and I do further return that John Rycraft, the person named in said writ as being imprisoned by me, was at the time of said service, and now is, imprisoned by me, and now is in my custody; said Rycraft having been delivered to me by S. V. R. Ableman, U. S. Marshal Dist. Wisconsin; and is now before the Supreme Court of the State of Wisconsin

as within commanded. That said Rycraft is so im- <span>June Term 1854.</span> prisoned and in my custody as sheriff and jailor of Milwaukee county in the State aforesaid, under and <span>In re Booth and Rycraft.</span> by virtue of a conviction, or supposed conviction, of the U. S. Dist. Court of the Dist. of Wisconsin, and under and by virtue of a supposed sentence of said court, as set forth in a transcript of the record of such supposed conviction, which is hereto annexed and marked 'A,' and made a part of this return; which said transcript is the warrant of commitment; and is the only warrant, paper or authority under or by virtue of which the said John Rycraft is held in custody and imprisoned by me."

(Signed) "S. S. CONOVER,

"Jan'y 30, 1855."    "Sheriff Mil. Co. Wis.

The transcript marked "A," referred to in the Sheriff's return is the same as that annexed to the petition hereinbefore set forth.

And on the same day, S. V. R. Ableman, marshal aforesaid, made return of the writ directed to him, as follows:

"To the Supreme Court of the State of Wisconsin: Without acknowledging the jurisdiction of the Hon. Court in the premises, I respectfully make return to this writ of Habeas Corpus, that in pursuance of a sentence of the District Court of the U. S. for the district of Wisconsin, I, as marshal for said district, conveyed one John Rycraft to the jail of Milwaukee county, and delivered him into the custody of the sheriff for said county, or jailor in said jail, who received him into his custody by virtue of a law of said State, that 'all sheriffs, jailors, prison keepers, and their and each and every of their deputies within this State, to whom any person or persons shall be

sent or committed by virtue of legal process issued by or under the authority of the United States, shall be, and they are hereby enjoined and required, to receive such persons into custody, and to keep them safely until they be discharged by due course of the laws of the United States; and all such sheriffs, jailors, prison keepers and their deputies, offending in the premises, shall be liable to the same pains and penalties, and the parties aggrieved shall be entitled to the same remedies against them, or any of them, as if such persons had been committed to their custody by virtue of legal process issued under the authority of this State.'

"That if by said sentence the said sheriff had not received said person into his custody, I should have so reported to the court, and have conveyed him to some other place or person as I should be commanded. But the said person being so received into the custody of the sheriff or jailor of such county, I have no further custody or control of the body of the said John Rycraft, and cannot therefore have his body in court as commanded in said writ."

(Signed)   "S. V. R. Ableman, *U. S. Marshal.*"

To these returns demurrers were filed respectively, and it appearing to the court that the attorney of the United States had not been formally notified, it was ordered that the hearing be postponed until the second day of February, and that the attorney of the United States have notice.

*Lakin & Steever,* for the petitioner Rycraft.

*J. H. Paine,* for the petitioner Booth.

The cause having been argued by counsel for the

petitioners and submitted, on the third day of Feb-
ruary the Justices delivered their opinions seriatim.

Whiton, C. J.   My opinion in regard to the act of
Congress passed on the 18th of September, 1850,
called the Fugitive Slave Act, under which it is con-
tended the petitioners were convicted, was given at
the last term of this court.   It is not my intention on
the present occasion to say anything upon that subject.
As my views in regard to it are unchanged, a further
discussion of the questions growing out of the act, by
me, is wholly unnecessary.   Nor do I deem it impor-
tant to express an opinion as to whether those por-
tions of the act which I deem unconstitutional and
void, so vitiate the whole act as to make a criminal
conviction under it impossible.

An act of the Legislature which is unconstitutional
in some of its provisions, is not of necessity entirely
void and inoperative.   It may contain provisions
which are valid and obligatory, but whether this is
true of the act of Congress in question, I shall not on
the present occasion enquire, as I concur in the opin-
ion expressed by Justice Crawford in regard to the
pretended conviction of the petitioners before the
District Court of the U. S. for this District.

If the conclusion arrived at by Justice Crawford,
that that court had no jurisdiction to pronounce a
judgment, is correct ; in other words, if the pretended
conviction of the petitioners, and the judgments against
them are mere nullities, it seems clear that they ought
to be discharged, if this court has the power to dis-
charge them.

It will not be denied that the Supreme Court of a
State, in which is vested by the Constitution of the

State, the power to issue writs of Habeas Corpus, and to decide the questions which they present, has the power to release a citizen of the State from illegal imprisonment. Without this power, the State would be stripped of one of the most essential attributes of sovereignty, and would present the spectacle of a State claiming the allegiance of its citizens, without the power to protect them in the enjoyment of their personal liberty upon its own soil. Were we to hold that we are without this power in a case like the present, we should be obliged so to hold in a case where not even the forms of law were observed; when, for instance, a citizen of this State should be thrown into prison, by the arbitrary order of a judge of a court of the United States, without a trial.

In my opinion, the State governments and State courts are not reduced to this humiliating condition. They are not obliged to look on and see the citizens of the State imprisoned for no lawful cause, without the power to grant that relief which all governments owe to those from whom they claim obedience. The petitioners must be discharged.

NOTE.—At the time when the petitioners were discharged and the above opinion was pronounced, I had not time to examine all the questions involved in the application for the discharge of the petitioners, as fully as I desired, or as the importance of the questions demanded. I have therefore concluded to add a short note to the opinion.

It is stated in the opinion, that the Supreme Court of a State which has power to issue the writ of *Habeas Corpus*, and to decide the questions which the writ presents, has the power to discharge a citizen of the State from *illegal* imprisonment. This, I suppose, will not be denied as a general proposition. But it is contended that when the State court ascertains that the imprisonment is by virtue of a

judgment of a court of the United States, it must stop its inquiry, and refuse to interfere ; it must not look to see whether the judgment is valid or not, nor whether the court had any jurisdiction to render the judgment. It is contended that in no other way can the courts of the States and of the United States be prevented from coming into collision. This claim, in behalf of the judgments of the courts of the United States, in criminal cases, of immunity from examination by the State courts, cannot in my opinion be maintained, except by denying to the State courts the power to issue writs of *Habeas Corpus*, and to determine the questions presented by them. For, if a court has authority to issue these writs and to decide the questions which they present, I am not aware of any principle which can be relied upon to prevent a full examination into the cause of the imprisonment of the person held in confinement, nor to prevent the court from discharging him, if his imprisonment shall be ascertained to be illegal.

To hold that a court has the power to issue writs of *Habeas Corpus*, and to decide all the questions which they involve, and yet has no power to decide whether the imprisonment of the person petitioning for his discharge by virtue of such a writ, is legal or illegal, seems to involve a very gross solecism.

This is a question of power merely. I am not considering the question whether the court erred, or not, in ordering the discharge of the petitioners, but whether the court had the power to examine into the cause of their imprisonment as set forth in the return of the sheriff of Milwaukee county to the writs, and to order their discharge upon arriving at the conclusion that the return showed no legal cause for their confinement. It seems to me very clearly, that to deny to the State courts the power which was exercised in this instance, is to deny to them the power to issue writs of *Habeas Corpus* altogether, and to decide the questions which they involve.

This immunity of the judgments of the courts of the United States in criminal cases, from examination by other tri-

13

June Term 1854.

In re Booth and Rycraft.

bunals, is not claimed for their judgments in civil cases. If an action is brought in a State court upon a judgment recovered in a court of the United States, or if such a judgment is drawn collaterally in question on the trial of a suit in a State court, the State court has the power, and it becomes its duty, to decide what effect shall be given to it. The State court does not of course possess the power to reverse the judgment, but it does possess the power to decide what effect it shall have upon the case pending before it. It acquires the power to make this decision by means of the suit which is on trial. Having jurisdiction to try that suit, it has the power to decide every question which the suit involves. This power of courts, whether State or Federal, to decide what effect shall be given to the judgments of other courts, when drawn in question in cases which are on trial before them, I have never heard questioned. That they have the power, is too plain for argument.

Now, if the State court has the power to issue writs of *Habeas Corpus*, and to decide all the questions which they involve, can it, with any propriety, be denied the power to decide what effect shall be given to a judgment of any court, if such judgment is drawn in question in a case commenced by the issuing of such a writ, and which is lawfully pending before it? It seems to me to be very clear, that if it has the power to entertain the proceedings instituted by the issuing of the writ of *Habeas Corpus*, and to decide and adjudicate upon them, it has the power to decide this question.

In regard to the effect of the pretended judgment in the District Court of the United States, I have little to say in addition to what appears in the opinion. If that court had no jurisdiction to give a judgment against the petitioners, the form of a judgment which was entered up against them, can have no power or effect. It was a mere nullity, and could not prevent their discharge.

That the court had no jurisdiction, is to my mind clearly shown in the opinion of Justice Crawford.

CRAWFORD, J. Since the decision in the case of Sherman M. Booth, which came before us by *certiorari* at the last term of this court, I have taken occasion to review the opinion given by me in that case, in order to discover whether I have erred in any of the positions then assumed by me.

That opinion was written during the active duties of a general term, and without an opportunity for very great deliberation. The result of my re-examination of that case, however, has produced no change in my views of it; and so far as the questions then presented are involved in the disposition of the present case, I deem it only necessary to say, that my opinion then given remains unchanged.

The simple question which attracts my attention in this case is, whether the District Court of the United States for this District, had jurisdiction of the offence of which this petitioner was convicted in that court; because, if it had such jurisdiction, it matters not how illegal, unjust or arbitrary the proceedings in that court may have been, nor how many errors may have been committed upon the trial; if the court had jurisdiction of the subject and of the person charged, it is by no means my duty as a judicial officer of this State, to revise the decision or correct the errors of that court, in a case properly within its cognizance. That is the function of a superior federal tribunal, if such revising power were provided or given, or deemed necessary by Congress.

The District Court of the United States for this District, is a court of special or limited jurisdiction. It can take cognizance of offences punishable by the laws of the United States, and of such offences it has exclusive jurisdiction; but it possesses no power to

JUNE TERM
1854.

In re
Booth and
Rycraft.

take cognizance of, or punish offences against the laws of the State. Of these latter, the State tribunals have a jurisdiction equally as exclusive as is the jurisdiction of the federal courts over offences provided for by the laws of Congress. It cannot be necessary to refer to authorities to sustain this position. It is a well-settled principle, that courts of inferior or limited jurisdiction, which do not proceed according to the course of the common law, but derive their special authority from statutory provisions, are confined strictly to the exercise of those powers conferred upon them, and the facts necessary to give them jurisdiction must appear affirmatively on the face of their proceedings, and cannot be presumed.

It is not denied that this principle applies to all *mere inferior tribunals*, but that it extends to the Circuit and District Courts of the United States has been frequently denied by the Supreme Court of the United States.

In Kempe's Lessee *vs.* Kennedy, (5 *Cranch*, 185,) that court held that " the courts of the United States are all of limited jurisdiction, and their proceedings are erroneous, if the jurisdiction be not shown upon them. Judgments rendered in such cases may certainly be reversed, but this court is not prepared to say that they are absolutely nullities which may be totally disregarded." So also in McCormick *vs.* Sullivan, (10 *Wheat.* 199,) the same court in speaking of the inferior courts of the United States, say : " They are all of limited jurisdiction, but they are not on that account inferior courts in the technical sense of those words, whose judgments, taken alone, are to be disregarded." The same doctrine is illustrated and acted upon in *Ex parte* Tobias Watkins,

(3 *Peters*, 193,) and in Kennedy et al. *vs.* Georgia
State Bank et al., (8 *How.* 156,) and the basis of the
rule must be found in that *presumption* of jurisdiction
which the law raises, that the solemn adjudications of
a court of record, have been given in cases only in
which it had power to act. This presumption cer-
tainly applies to all courts of general jurisdiction,
and for the purposes of the present case, and in obe‾
dience to the decisions of the Supreme Court of the
United States already cited, we may apply it to the
District Court of the United States for this District,
but if the record of a judgment or proceeding in that
or any other court whatever, should come before us
collaterally, and upon the face of the record, it was
apparent that the court had no jurisdiction to render
any judgment in the premises, we would not and
could not hesitate to disregard it ; there the presump
tion in favor of the validity of the proceedings would
be destroyed, and the judgment would have no force.
Suppose, for instance, that a judgment record, coming
from a court of general jurisdiction, should disclose
the fact, that without affording the defendant an op-
portunity to make a defence, and without in any
manner citing him to appear, either by service of
*mesne* process or otherwise, the court had proceeded
*ex parte*, and rendered a judgment against the defen-
dant, surely we would be justified in treating the
proceeding as *coram non judice.*

Now, the return made by the sheriff of Milwaukee
county in this case, contains a record of the proceed-
ings in the District Court, in which this relator was
convicted and sentenced, which not only takes away
mere presumption, but incontestibly shows, that the
District Court had no jurisdiction of the subject com-

June Term
1854.

In re
Booth and
Rycraft. plained of in the counts of the indictment upon which he was convicted ; and if this position be true, we may appropriately use the language of Judge Evans in the case of Hill *vs.* Robertson, (1 *Strobhart's Law R.* 1 :) "It would be a waste of words to attempt to prove, that the proceedings of a court of limited jurisdiction, in a case clearly without its jurisdiction, are absolutely void, and may be so declared, whenever the question is presented, whether directly or collaterally."

The indictment upon which this relator was tried and convicted in the District Court, contained three counts, the first of which may be considered as properly charging an offence within the seventh section of the act of Congress of Sept. 18, 1850, known as the "Fugitive Slave Law." The second and third counts, however, do not, in my opinion, set forth or charge an offense punishable by any statute of the United States, or of which the District Court has any jurisdiction whatever.

The relator was found guilty as charged in the second and third counts of the indictment, but was not convicted of the offense charged in the first count, so that if the counts on which the conviction took place, do not show a case within the jurisdiction of the Court, the conviction and sentence are not only unauthorized by law, but are *coram non judice.*

The second count charges that " John Rycraft of &c., at &c., on &c.; knowingly and wilfully, *did aid, abet and assist one Joshua Glover to escape from the custody of Charles C. Cotton,* then and there being a deputy of the Marshal of the United States for the District of Wisconsin, he, the said Joshua Glover, having been theretofore [apprehended by, and then

and there being in the custody of the said Cotton,"
&c. The count then proceeds to recite the warrant
by virtue of which said Glover was apprehended,
and which had been issued by the Hon. Andrew G.
Miller, judge of the District Court of the United
States. From the recitals contained in the warrant
set forth in the indictment, we find that a complaint
has been made before Judge Miller, by a person claim-
ing that said Glover owed service and labor to him,
the claimant, according to the laws of the State of
Missouri, and that upon that complaint the warrant
had issued against Glover as a fugitive slave.

The third count is substantially the same as the
second, the principal difference being that it recites
the affidavit of the claimant as well as the warrant
issued by the district judge.

The intention, no doubt, was to set forth in each of
these counts, an offence within the seventh section
of the act of 1850, but in my view of them, they merely
charge an *aiding, abetting and assisting a person
named Glover, to escape from the custody of Mr. Cot-
ton, a deputy of the marshal of the United States.*
Who is this Glover thus aided? or, in other words,
from the averments and finding of the Grand Jury, as
set forth in these counts, and not from the recitals of
the affidavit and warrant therein, what is the kind of
person alleged to have been aided? For if it be not
shown that he is within the description of person, the
aiding in the escape of whom is declared to be an of-
fence, then so far as the act of 1850 is concerned,
these counts charge no offence.

The seventh section provides for the punishment of
any person, who shall knowingly and willfully " aid,

abet and assist such person *so owing service and labor*, *as aforesaid*, directly or indirectly, to escape, &c."

Now, it is not the aiding of *any* person to escape which is here provided for, but it is the aiding of a person of a specified *status* or condition, to wit, one who owes service or labor *as aforesaid*, and these words most evidently refer back to the commencement of the sixth section, where we find the person described as one " held to service or labor in any State or Territory of the United States." This is the only reasonable construction which I can place upon the language of this section, for certainly the assisting of a person not owing service or labor in any State or Territory, would not come within this section. Suppose a person, undoubtedly a free man, were in custody, on claim under this law, and without the use of any force or violence he was assisted to escape, how could it be said that the aid had been rendered to a person " *so owing service and labor ?*" To constitute an offence under this, as under any statute, every circumstance necessary to an exact description of the offence, as defined by the statute, must be critically set forth, and the application of this rule to the counts of this indictment, would require that the man Glover should have been described as a person owing service or labor in some State or Territory. By no principle of law can we infer, from the words used in these counts, that Glover owed service or labor—on the contrary, we are bound to suppose that Joshua Glover was equally as free as any other person. If he had been in the custody of the officer, for the violation of some other law of Congress than the act of 1850, the aiding him would not be an offence within that act.

But from the legitimate averments of these counts, I

cannot find a description of any offence for which Glover was in custody—and the *gravamen* of the charge is merely, that the relator aided Glover to escape from the custody of the deputy marshal Cotton, which custody was by virtue of process.

The twenty-second section of an act of Congress approved April 30th, 1790, defines the offense of *resisting* or *obstructing* officers of the United States in serving of process. The language of that act is "obstruct, resist or oppose, any officer of the United States in serving or attempting to serve or execute any *mesne* process or warrants, or any rule or order of any of the courts of the United States," &c.

The distinction in my judgment, between the ingredients of the offense of *obstructing* and *hindering* an officer in the service of process under the act of 1790, and the offense of *aiding, abetting and assisting* a person in legal custody to escape therefrom, (if the latter be really declared to be an offense,) consists in this, that in the former some *active interference* of the person charged is necessarily involved, while in the latter the end or object may be attained—the aid and assistance afforded, without any connection with or hindrance of the officer or his process. A person in passing beneath the window of a room in which a prisoner is confined, in custody of the marshal, might cast a key through the open bars or casement, and thereby enable the captive to withdraw the bolts of his prison and escape, but although this would be a grave offense, I apprehend it could not bring the offender within the act of 1790. It would be an aiding and abetting in an escape, but it could hardly be

deemed an obstructing or hindering the officer in the service or execution of process.

The indictment preferred against the relator, how ever, contained one count (the first) which charged an offence within the jurisdiction of the District Court, and the question whether, inasmuch as that court had jurisdiction to try the offence charged in the first count in the indictment, it did not thereby acquire a control of the whole case, and preclude any inquiry into its power here, has engaged my attention.

I am not, upon this writ of Habeas Corpus, inquiring into a mere question of criminal pleadings—the inquiry is one affecting the jurisdiction and power of the court, which entertained the indictment before us, and proceeded to verdict and judgment thereon.

I am entirely satisfied, that if the jury had returned a general verdict of guilty on this indictment, the interference of this court with the sentence of the District Court of the United States would have been wholly unwarrantable ; because in that case there would have been a conviction for an offence within the power of the District Court to try, determine and punish. But the record which constitutes the *mittimus* before us, shows that the indictment upon which this relator was tried contains one count for an offence within the jurisdiction of the court which tried him, and two counts presenting no crime for which a person could be tried in that court. Upon the first count there has been no conviction, and consequently there can be no punishment: so that the sentence and imprisonment of which the relator now complains, must be for an alleged offence beyond the control or cognizance of the court which imposed that sentence.

If, in the District Court an indictment were presented, some of the counts of which charged a violation of the revenue laws of the United States, and other counts charged libel, or assault and battery, and upon trial a conviction were obtained on the counts charging libel, or assault and battery, would an imprisonment on such a conviction, where the charge of violating the United States revenue laws had not been sustained by the verdict, be beyond the inquiry of this court?

Would the conviction and sentence in such a case, be the "final judgment" of a court of *competent criminal jurisdiction* of the offence of which the party was convicted, or would the imprisonment consequent on such a sentence be "by virtue of process issued by any court or judge of the United States, in a case where such court or judge has *exclusive* jurisdiction?" I cannot think so.

Whenever, in a case like the present one, a writ of Habeas Corpus issues, directed to a federal officer, and he makes a proper return, setting forth the cause or process by which the party is restrained of his liberty or confined, I conceive it to be the duty and within the legitimate power of this court, or the officer before whom the writ is made returnable, to examine as well the process by which, as the cause for which the party is restrained or imprisoned. If the process be such as might be issued by the tribunal or officer who issued it, and the cause or matter in which the proceedings were taken, be within the authority or power or jurisdiction of the court or officer, then there is a plain duty imposed upon the court or officer who issued the writ of Habeas Corpus, to remand the party; but if on the contrary, the process or warrant for

the imprisonment be unauthorized, or the subject matter upon which the party has been deprived of his liberty, be not within the authority or cognizance of the court or officer who has assumed to act, then it is equally incumbent on us to discharge the party.

The Constitution of this State, (art. 1, sec. 8) secures to every person within the State the privilege of the writ of Habeas Corpus, and the use of that writ is adapted to all cases of *illegal* restraint or confinement. The justices of this court as well as judicial officers of the State, who are vested with the power of awarding this writ, would be recreant to the duty imposed upon them, and to the trust reposed in them by the people, if in any case of illegal restraint in which they have power to act, they hesitate to perform the requirements of the Constitution and laws of the State, by using this writ as a means to see that no person within the boundaries of this State shall be deprived of his personal liberty without the authority of law. If this were not so, the utility of the writ of Habeas Corpus would not only be greatly invaded, but in many instances it would become a name without a substance. It is idle to say that the use of the writ to this extent may be productive of dangerous consequences, or result in any serious collision between the federal and the State officers. So long as the functionaries of these respective powers are true to the obligation and duty imposed upon them—so long as they are careful not to transcend the limits and scope prescribed to them, there is no danger to be apprehended. If either, indeed, should assume to act in derogation of the prerogative of the other, a means of correcting the evil would be very necessary, but we are not without that corrective. An unwar-

rantable infraction of the jurisdiction of the State tribunals by the federal courts, would call forth an assertion of their prerogatives and power by the State Courts, and if in this the latter were wrong, a peaceful means of redress is afforded by a resort to the court of *dernier resort*, the Supreme Court of the United States, whose decisions should and would be acquiesced in by all parties.

Viewing this case as it is presented by the return, I am of the opinion, that the relator is entitled to be discharged from the custody of the sheriff of Milwaukee county, inasmuch as the record of conviction and sentence from the District Court of the United States for this district, by which his imprisonment is sought to be justified, presents no conviction and sentence of an offence which that court had jurisdiction over.

On the argument of this cause the counsel for the relator insisted upon a distinct ground for the discharge.

It was that the act of Sept. 18th, 1850, was entirely unconstitutional and void. A correct understanding of the views of the question, taken and expressed by the several members of this court at the last term, would perhaps have rendered it unnecessary to urge this point in the present case. I need only remark that upon this question we each entertain the opinion then expressed.

The case of Sherman M. Booth, which was argued and considered in connection with this case, is substantially disposed of in the foregoing opinion. The defect of jurisdiction in the U. S. District Court is equally patent in this case, and therefore I believe he is entitled to be released from imprisonment.

JUNE TERM 1854.

In re Booth and Rycraft.

SMITH, J. The facts in these two cases are essentially the same, and any observations which I feel called upon to make will apply to both cases alike, and therefore, for the sake of convenience, mention will be made of the petition of Rycraft only.

It is, perhaps, needless to say, that the subject matter of this petition has been considered with all the deep anxiety, and careful deliberation, which the time would permit, and the occasion so imperiously required. Justly appreciating the delicacy of the position of the court, and as we thought, actuated by a due regard to the representatives of the United States court and government, we postponed the hearing of the application from Tuesday till Friday, and ordered that formal notice be served upon the district attorney of the United States for the district of Wisconsin, of the pendency of the petition and of the time of hearing ; although it was apparent that he was not unadvised of the proceedings. He did not see fit to appear, and the government of the United States was not *formally* represented, except by the marshal, as will appear by reference to his return to the writ issued to and served upon him, contained in the statement of the case. The sheriff of Milwaukee county also made return to the writ issued by him, together with the day and cause of the caption and detention of the petitioner, and thus all the parties (including the legal representatives of the government of the United States,) as well as the subject matter of the writ, together with all the questions which the case presented, were properly and regularly before the court.

It is also proper here to remark, that the authority of this court to issue the writ of Habeas Corpus in

this case, is not derived from the Revised Statutes, or any other enactment of the legislature, but from the Constitution of the State : That the jurisdiction of the Supreme Court, of this writ, and to hear and determine the same, is co-extensive with the territorial limits of the State, and that the legislature cannot if they would, restrict the exercise of this power, conferred upon the court, not by legislative enactment, but by the Constitution itself. A judge in vacation, or an officer authorized by the legislature to issue, hear and determine the writ, may perhaps be limited to the provisions of the statute. Not so the Supreme Court in term, whose jurisdiction is co-extensive with the State in this behalf, which no legislative enactment can circumscribe or impair, which penetrates the remotest corners of the State, and is competent, on petition, to inquire into the condition of every citizen whose liberty is assailed.

On the application of Sherman M. Booth at the last term of this court for a writ of Habeas Corpus, no copy of the indictment was presented, but only a copy of the warrant upon which he had been arrested, which recited merely, that he had been indicted under the act of Congress of 1850, for aiding the escape of one Joshua Glover, &c. This was an ordinary bench-warrant, to bring in a defendant to answer to an indictment found in the District Court of the United States; and it appeared to us, that we ought not (and indeed, without an inspection of the indictment a copy of which was not presented, we could not) interfere with the regular action of that court, but were bound to presume, that if the indictment, when at the proper time it should be brought up for examination, failed to present a case of which that court had juris-

JUNE TERM
1854.

In re
Booth and
Rycraft.

diction, or charged no offence at all, the court in which it was found would so decide, and to leave all such questions preliminarily within the proper scope of the power of that court. But now, the case is different. All those questions have been properly and timely urged, and without avail; and the petitioner comes before us and shows by the return of the officer that he has been pressed on to a conviction, and sentenced to imprisonment, and is now actually imprisoned, within this State, and that the sole authority therefor, *is a transcript of the record of such conviction.*

The first, the fundamental question which the case presents, is : Has this court the power to inquire into the legality of the authority by which it is claimed, the prisoner is, and ought to be held in custody ?

It seems to me that the solution of this question is to be found in a few simple elementary propositions, which require little or no proof or argument to sustain them.

It is the duty of government to protect and secure the just rights of its citizens, whose support and allegiance it commands, among which is the right to personal liberty.

This duty of the government is to be measured only by the extent of the individual right, and it is bound to provide means adequate to its full and complete performance.

If the government be complex, the means may be distributed, and the obligations of duty divided, but not so as to come short in the whole, of the object to be accomplished.

Ours is a complex system with powers distributed to each of its parts, but all of its parts together con-

stituting an entire sovereignty, and so, of course, in duty bound, as a whole, to furnish complete protection.

Whatever powers and duties are not delegated or assigned to one department or branch of the entire sovereignty, must remain in the other ; the Federal and State organizations together constituting a complete government, endowed with all the attributes properly pertaining to a sovereign State.

If one be made up of delegated, and the other of reserved powers, the duties assigned to the former can only be co-extensive with the powers delegated, and the duties of the latter must remain commensurate with the powers reserved or not delegated, and these powers adequate to every emergency not within the scope of the former.

The federal government is one of delegated powers, the State government is one of inherent or reserved powers ; the former competent to act only within the sphere prescribed by the Constitution ; the latter exercising all the functions of sovereignty not delegated or relinquished by that instrument.

The power to guard and protect the liberty of the individual citizen is inherent in every government ; one which it cannot relinquish, which was reserved to the States, which was never granted to the Federal government, has never been claimed by it or for it, but has always been conceded to the States, without which they could not exist, because it is obvious that they could claim no allegiance or support from their citizens whom they had not the power to protect.

If, therefore, it is the duty of the State to guard and protect the liberty of its citizens, it must necessarily have the right and power to inquire into any authority by which that liberty is attempted to be taken

away.   But the power to inquire, includes the power to decide.   The right of the sovereign to demand by what authority such imprisonment is attempted, implies the obligation and duty of the person imprisoning to respond : the right to demand such authority on the one hand, implies on the other the duty to exhibit it.

The States and people thereof have delegated to the Federal government the power to imprison the citizen in certain cases, but in none other.   So far, then, as that government acts upon the power thus delegated, the States cannot interfere to protect its citizen, but in every other case they not only have the power, but it is their solemn duty to interpose their authority.   As the power by which the federal government can imprison, is a delegated power, it must necessarily appear, in every case where it imprisons, that it is acting in conformity with some power delegated.   It must be "nominated in the bond." Its jurisdiction is never presumed, but must always affirmatively appear.   1 *Wheat.* 304, 380.

The Constitution of the United States is the deed of grant, so to speak, expressing in written terms all the powers delegated to the Federal government, and prohibited to the States.   The States respectively retain all else of sovereignty, limited only by the local Constitutions prescribed by the people of each.

Therefore, to me it is plain, that when the Federal government assumes to act in a given case, it is bound to exhibit a case within its prescribed powers, for a denial of this proposition, involves the assumption of inherent powers, derived from a source other than the States and their respective people, transcending the Constitution itself.

As, therefore, the STATES *delegated*, and the federal government *took* power, limited in character and extent, the latter is at all times answerable to the former, and may be required to exhibit the constitu-tional warrant by which it claims to do, or refuses to perform any given act, when so required by the pri-mary original authority, in conformity with the modes lawfully established.

JUNE TERM 1854.

In re Booth and Rycraft.

In the Constitution of the United States sound poli-cy required the incorporation of a function by which the government thus created, might be such in fact, by executing its own constitutional laws and decrees, and to that end be enabled to act upon individuals in all of the creative, constituent sovereignties. This could only be accomplished by the creation of a judi-cial department, supreme and independent within its prescribed sphere, whose process should extend to every citizen. But in giving up so much of this vital element of sovereignty as was deemed essential to the system, the States, or the people thereof respectively, carefully guarded it, hedged it about with provisions which, it was supposed, would be impassable. They prescribed its extent (that is of the judicial power of the United States,) by words most carefully selected, whose import could, as was believed, scarcely be mis-taken, and beyond which it was supposed, no ven-turesome mind would rush.

"The judicial power" (of the United States) "shall *extend to* all cases in law or equity, arising under this constitution, the laws and treaties made or which shall be made under their authority," &c. *Const. U. S. Act* 3, § 2. *Martin vs. Hunter's Lesses*, 4 *Munf*. 1 (*Vir. Rep.*) The words "*extend to*," might, per-haps, on the theory of liberal or latitudinarian con-

struction, be held to be exclusive in their import, in behalf of the judicial power of the United States, were it not for another provision of that instrument which will presently be noticed. But the very selection of the words " *extend to,*" when we consider the extreme caution observed by the members of the National Convention which framed the Constitution, is too significant to be overlooked, and ought to admonish us against a rash assumption of exclusive jurisdiction of the subjects therein mentioned. That which merely " *extends to*" a particular subject or class of subjects, cannot, upon any legitimate mode of interpretation, be considered as comprising the whole of such subject or class of subjects, to the exclusion of every other power. Several powers may " *extend to*" a given class of subjects; but one can comprehend them all. The *extension* of a power *to* a subject by no means merges it exclusively within such power.

But we are relieved from the necessity of criticism upon these words, by another provision of the same instrument, which is in the following words:

"This Constitution and the *laws of the United States which shall be made in pursuance thereof,* and all treaties made, or which shall be made, under the authority of the United States, shall be the supreme law of the land; *and the judges in every State shall be bound thereby,*" &c.    *Const. U. S., Art.* 6.

Here is a distinct recognition of the power and duty of State judges, not to be bound by all the acts of Congress, or by the judgments and decress of the Supreme Federal Court, or by their interpretation of the Constitution and acts of Congress, but by " *this Constitution,*" " *and the laws made in pursuance thereof.*" The requirement is, that the State judges shall

conform to the Constitution, and decide upon all
questions which may arise within their jurisdiction
under the same, as well as the laws of the United
States "*made in pursuance thereof.*" It will be seen
that the State judges and courts are by no means
alien to that instrument, but bound by it in the
same manner as are the federal courts and judges·
If the words "*extend to,*" in a former provision were
intended to vest sole, exclusive and ultimate power of
that class of subjects, in the federal courts and judges,
why should the duty and obligation of construction,
obedience and conformity be imposed under the
solemn obligation of an official oath, upon the State
judges? To bind the judicial conscience, and exclude
the judgment from consideration, is an absurdity too
flagrant to be attributed to the members of the con-
vention which framed our national Constitution.
Why are the Constitution and the laws of the United
States "*made in pursuance thereof,*" proclaimed as the
supreme law of the land, and hence the paramount law
of every State, and the judges of every State bound
thereby, unless those subjects were addressed to the
judicial mind and conscience of those officers? and
why that careful phrase, "*laws made in pursuance
thereof*" unless those officers were required to deter-
mine whether or not the acts of Congress subject to
their consideration and commanding their obedience,
*are* made in pursuance of, or are repugnant to the
Constitution.

It would seem obvious that if certain powers and
attributes of sovereignty were reserved to the States,
they must necessarily have the right to protect them.
It would have been stupendous folly to insist upon
an express amendment to the Constitution, that all

June Term 1854.

In re Booth and Rycraft.

powers not delegated to the United States nor prohibited to the States, are reserved to the States respectively, or to the people," if, among these powers was not reserved that of protecting them. If to the federal government were granted the sole power to decide what powers were reserved and what were not, and to enforce its decision upon the States, the incorporation of this amendment would be a mere empty sounding announcement, placing the governments of original, inherent and reserved powers at the mere forbearance of the federal government. This would indeed be " bringing the machine to the field after the battle is over." The very idea of division is inseparable from that of control of the parts distributed or retained to, or by each agent in the process. That part of the organization which operates upon delegated power, must have the right to control, modify and protect such power ; that which operates by virtue of the powers reserved and inherent must have a like right in respect of the powers so reserved. As regards individuals, there is a superior, not to one of the parties only, but to both, to determine between them. Not so as to divided sovereignty, unless an umpire outside of either is expressly provided, which would be incompatible with the sovereignty of either. The deposition of the power of final arbitrament in the one or the other of the parties, is nothing less than placing one at the mercy or forberance of the other.

But it may be said, if this be so, our system is not perfect, and there can be no uniform will to guide its operations. So indeed is the truth. But, it should be remembered that where one will rules, there can be no freedom for the many. The *imposition* of uni-

formity is but another name or process for usurpation or tyranny. It was never intended that there should be one uniform will to administer this government. The object of delegating judicial power to the federal government, was two-fold; to enable the government to protect the powers delegated by the direct execution of them through its own instrumentalities; and also to operate as a check upon the other departments, the executive and legislative. Each is independent and co-ordinate. In like manner, and for a like purpose, were certain powers delegated to the federal government as a whole, while other powers were reserved to the States, and among these reserved to the State governments was the judicial power, being as essential to the States for the protection of their reserved powers, as it is to the federal government for the protection of its delegated powers. It is equally essential to both. Without it, neither would be a government. It being equally necessary to both, it is obvious that one cannot be subjected to the other without endangering the very object of its institution and endowment. Consequently, both are co-equal and co-ordinate; as much so as are the several departments of each government co-equal and co-ordinate with each other.

It has been said, and repeated with emphasis, that if State courts are permitted to call in question the jurisdiction of an inferior court of the United States, (as the District Courts of the United States must be considered in reference to the Supreme Court of the United States and of the respective States, however they may be regarded in reference to the technical term "inferior courts" as used in the judicial system of England,) there must necessarily result great confu-

June Term
1854.

In re
Booth and
Rycraft.

sion in the interpretation of the Constitution, and different rules of interpretation prevail in different States—that the execution of the judgments of the United States Courts may be arrested by the State Courts, and "revolution or dissolution must soon follow." But a glance at the practical working of our system of government shows these assertions not only to be unfounded in truth, but most vicious in their tendency. ° One among the objects in distributing the powers and elements of complete sovereignty, was expressed in the preamble to the federal Constitution, " to secure the blessings of liberty," &c., and the theory is apparent, viz : to provide such a distribution of powers, as to make one branch or department operate as a check upon another, and to preclude the possibility of any one branch or department from assuming or exercising the whole or those of another, and to make each independent of the other, but all ultimately responsible to the primary source of all power.

The principle of this objection applies as well to the different departments of the federal government, as to the courts or other functionaries of the respective States. The federal courts may be of the opinion that a penal statute of Congress is constitutional, and pass sentence upon one convicted of its violation. The federal executive may deem the statute unconstitutional, and remit the execution of the penalty. Is not the course of justice as much frustrated in this case, as though a State court had interfered to protect a citizen from the usurpation of two departments of the federal government—the legislative and judicial ? Again, the United States Courts may adopt rules of practice which Congress may regard as an assump-

tion of legislative power, and repeal them or forbid their observance ; or Congress may prescribe certain rules of practice for the courts, such, for example, as the manner of selecting and empannelling jurors, which the courts will disregard ; the courts persist, Congress persists. Here is confusion indeed !—" collision," and all its attendant evils. We may go on and suppose a thousand cases in which the harmony of government may be disturbed, which would be as idle as their suggestion in support of unlimited power is reprehensible. It is enough to say, that all history, as well as philosophy, teach us, that individual liberty is never safe where the power of the rulers is unrestricted, and that every guaranty of personal liberty is liable to abuse. The former condition has always resulted in despotism intolerable, the latter may expand into license, and license whirl into anarchy.

Such, however is not the tendency of our system nor can it occur, until the officers of the government shall become faithless to the grants and covenants of the constitution, and the people unworthy of the liberty which their constitution was designed, and is competent to secure.*

---

* It is the practice, of late, to hold up before the mind such frightful pictures of " collision," "resistance," " civil discord," "revolution," "anarchy" and " dissolution," that it would seem, that any effort of resistance to the exercise of unauthorized power, and every attempt faithfully to execute official duty imposed by the Constitution and laws, is to be dreaded as an approach to treason; that every diversity of opinion or action between the functionaries of the two governments, must necessarily terminate in a dissolution of the Union; that the hope of the nation rests, not so much in the intelligence and patriotism of the people as in the successful pursuit of a runaway negro. But the real danger to the Union consists, not so much in resistance to laws constitutionally enacted, as in acquiescence in measures which violate the Constitution. It is much safer to re-

It seems to me that the provision of the Consti-
tution before referred to, is an express recognition of
the judicial power of the States, as extending to all

sist unauthorized and unconstitutional power, at its very commencement, when
it can be done by constitutional means, than to wait until the evil is so deeply
and firmly rooted that the only remedy is revolution. If collisions between the
departments of the same government have heretofore occurred without dissolu-
tion, may we not hope that it will be able to stand yet awhile, in spite of an oc-
casional difference and discussion between the State and Federal functionaries?

A very decided collision between the departments of the federal government
occurred at an early day. In 1798 Congress passed an act to punish certain
kinds of libel, commonly called the "Sedition Act." The courts of the United
States proceeded to execute it. A number of persons were indicted under it,
convicted and sentenced. But the President, deeming the act unconstitutional,
arrested the execution of the judgments of the court in every instance. The
courts would convict and pronounce sentence upon the criminal, and the Presi-
dent would pardon; and yet the Union did not fall in pieces. At length Con-
gress became satisfied of the unconstitutionality of the act, and suffered it to
expire by its own limitation. One of the parties, named Matthew Lyon, was
convicted under the sedition act, and sentenced to pay a fine. The fine was col-
lected. The pardon of the President released him from imprisonment, but did
not refund the fine paid or collected; but thirty years afterwards, Congress re-
stored to the heirs of Lyon the amount of the fine and interest. Here was an-
other collision. I do not pretend to say whether Congress did right or wrong.
But I adduce these facts to show, that these "collisions," as they are now called,
but which are *merely the healthful operation of the very checks and balances which
the Constitution has wisely provided*, are not the frightful things which they are
represented to be; and also to satisfy those functionaries who so dread the con-
sequences of having their authority questioned, that the Union still survives.

In speaking of the conviction and pardon of Callandar, Mr. Jefferson says:

"You seem to think it devolved on the judges to decide on the validity of the
"sedition law. But nothing in the Constitution has given them a right to decide
"for the executive, more than to the executive to decide for them. Both magis-
"trates are equally independent in the sphere of action assigned to them. The
"judges, believing the law to be constitutional, had a right to pass sentence of
"fine and imprisonment; because the power was placed in their hands by the
"Constitution. But the executive, believing the law to be unconstitutional,
"were bound to remit the execution of it; because that power has been confided
"to them by the Constitution. That instrument meant that its coördinate
"branches should be checks on each other. But the opinion which gives to the
"judges the right to decide what laws are constitutional, and what are not, not
"only for themselves in their own sphere of action, but for the legislature and

laws of the United States, and a requisition of obe- <span>June Term 1854.</span>
dience on the part of the State judges, to all laws of
the United States, provided they are made in pursu- <span>In re Booth and Ryeraft.</span>
ance of the Constitution, and not otherwise.

This view is strongly corroborated by the histori-
cal fact, that many efforts were made in the national
convention to give to the several departments of the
federal government a supervisory control over those
of the States. But all these efforts were stoutly resis-
ted, and were ultimately relinquished. Those who
are curious to trace these efforts, from their first ex-
pression in the plans of constitution introduced by
Mr. Randolph of Virginia, and by Mr. Pinckney of

---

"for the executive also in their spheres, would make the judiciary a despotic
"branch.

"Nor does the opinion of the unconstitutionality, and consequent nullity of
"the law (the sedition law), remove all restraint from the overwhelming torrent
"of slander, which is confounding all vice with virtue, all truth with falsehood,
"in the United States. The power to do that is fully possessed by the State
"legislatures. It was reserved to them, and was denied to the general govern-
"ment by the Constitution, according to our construction of it. While we deny
"that Congress have the right to control the freedom of the press, we have ever
"asserted the right of the States, and their exclusive right to do so." 4 *Jeffer-*
*son's Complete Works*, 561.

"I discharged every person under punishment or prosecution under the sedi-
"tion law, because I considered and now consider that [law to be a nullity, as
"absolute and as palpable as if Congress had ordered us to fall down and wor-
"ship a golden image; and that it was as much my duty to arrest its progress in
"every stage, as it would have been to have rescued from the fiery furnace those
"who should have been cast into it for refusing to worship the image. It was
"accordingly done in every instance, without asking what the offenders had
"done, or against whom they had offended, but whether the pains they were suf-
"fering were inflicted under the *pretended* sedition law. It was certainly possi-
"ble that my motives in contributing to the relief of Callendar, and in liberating
"sufferers under the sedition law, *might* have been to protect, reward and en-
"courage slander; but they may also have been those which inspire ordinary
"charities to objects of distress, meritorious or not,—or, *the obligation of an oath*
"*to protect the Constitution, violated by an unauthorized act of Congress.*" 4 *Jeffer-*
*son's Complete Works*, 556.

JUNE TERM 1854.

In re Booth and Rycraft.

South Carolina, through all the stages of their progress and decline to their ultimate failure, may find a pretty full record in the "Madison Papers," or the fifth volume of "Elliott's Debates." The plan failed, and experience has abundantly shown, that it is to such failure, and to the tenth amendment of the Constitution subsequently adopted, that the States owe the preservation of their sovereignty, and their position as independent, co-equal governments, in the respective spheres prescribed to themselves and to the federal Union, and the people, the preservation of their liberties.

From these views, it is clear to me that the federal government can only operate within the precise sphere marked out by the Constitution; that the judicial power of the Union is as much circumscribed by the Constitution as every other department of the federal government; that an act of Congress without the constitutional sphere would be no law; that a judicial determination without the constitutional sphere, would be no judgment or decree; that of the acts of Congress, the State judiciary are bound to judge whenever they are brought in question before them, so as to ascertain whether such acts are "made in pursuance" of the Constitution; because, if so, the State judges are "bound thereby," and not otherwise.

.The States never yielded to the federal government the guardianship of the liberties of their people. In a few carefully specified instances they delegated to that government the power to punish, and so far, and so far only, withdrew their protection. In all else they reserved the power to prescribe the rules of civil conduct, and continued upon themselves the duty and obligation to protect and secure the rights

of their citizens declared to be inalienable, viz : "Life,
liberty and the pursuit of happiness."

It will readily be conceded, that the main provi-
sion which the people have made in the organ-
ization of their governments, for the protection of
these rights, in them individually, is found in the
judicial department. That is the arm of sovereignty
whose aid the citizen invokes when these rights are
individually invaded. The courts are open to receive
his complaint, and to afford him the redress which
the constitution and laws entitle him to demand.
Every citizen has the right to appeal to the funda-
mental charter of both sovereignties to which he owes ·
allegiance, to test the validity of the authority by
which his right to liberty is denied. It follows,
therefore, that the power which he has the right to
invoke in his behalf, must possess the right to inquire
into the conformity of the authority set up over his
natural rights, with the fundamental law. As the
State judiciary is the power to which the guardian-
ship of individual liberty is intrusted, it follows that
it must have the right to inquire into such conformi-
ty, unrestricted by, and independent of, the power
which demands his imprisonment.

It would seem obvious that this power to inquire
into the condition of the citizen, and to be informed
of the causes of his imprisonment or restraint, has
never been surrendered or relinquished by the States.
It is one of the highest attributes of sovereignty.
We look in vain among the various provisions of the
Constitution to find it delegated to the United States
government or any department thereof. Nor is the
relinquishment of this power found among any of
those prohibited to the States. Without the tenth

June Term
1854.

In re
Booth and
Rycraft.

amendment it would be clearly reserved to the States, because it is original and inherent in every government. If so, then the appropriate means and instrumentalities are alike reserved, inherent and original. Among such instrumentalities the writ of Habeas Corpus is especially recognized by the federal Constitution, and a positive inhibition upon the power of the government to interfere with its scope and functions, except in specified cases, is carefully inserted. As if it were not enough to restrict the general government to its specifically delegated powers, but to render the power of the States more conspicuous, certain and efficacious, for the protection of individual liberty and for the resistance of unauthorized, unconstitutional power, all power on the part of Congress to suspend even the benefit of the writ of Habeas Corpus is expressly denied, "*except in cases of rebellion or invasion.*" *Art.* 1, § 9, *clause* 2, *Const. U. S.*

Therefore, so far as the proceeding under this writ is concerned, it is original, and from the necessity of the case the jurisdiction of it is original in the States, and as the government of the United States cannot suspend its benefits, it cannot abridge the power and jurisdiction of the State judiciary in regard to any or all questions which the case of the writ may present—*that of federal jurisdiction among the number;* and that to no one can be granted exemption from the obligation of obedience to its mandates; and it clearly follows, that every individual within the state, no matter by whatsoever authority he may claim to act, is bound to obey the writ when issued by the proper state authority, because the highest earthly power which might otherwise at times be lost sight of, has expressly commanded such obedience, and inhibited the ex-

ercise of any power which might thwart its purposes.*

No person can be exempt from obedience to its mandate, and every act of the national or State legislature which directly or indirectly abrogates or even suspends its benefits, (except in the case of rebellion or invasion) is, in so far, absolutely null and void; and its execution will be enforced by all the power of the State and the Union, so long as their functionaries are faithful to their duties and oaths.

It is sometimes said that this writ is in the nature of a writ of error, to review the proceedings of an inferior court or magistrate. This is sometimes true

---

* " The laws of the land, administered by upright judges, protect every one "from the exercise of power unauthorized by the Constitution of the United "States. The Habeas Corpus secures every man here, alien or citizen, against "every thing which is not law, whatever shape it may assume. 4 *Jefferson's Complete Works* 257

It may be said that Mr. Jefferson is not judicial but rather political authority. But Mr. Jefferson was a lawyer by profession. All his writings show him to be deeply versed in the fundamental principles of the law, and the rules of adminis. trative justice. More especially was he eminently distinguished for his accurate conception of the principles upon which our government is founded. Besides, in the instances of official conduct to which he refers in the citations before made, he was acting under the solemn obligations of his official oath, as much so as were the judges of the Supreme Court in their decisions to which he refers. Moreover, it must be admitted that this is a case to be determined more by reference to, and appreciation of the principles on which government is founded, than by the technical rules of practice or of law by which causes between individuals are ordinarily to be adjudicated. The same argument which would preclude the State judges from observing fidelity to the Constitution of the United States according to their oath of office, would prostrate every department of the federal government at the feet of the federal judiciary, and would leave the State sovereignties helpless, impotent pre. tensions, and the federal legislature and executive, which the Constitution has created and endowed as co-ordinate departments with the judicial, the pliant subjects of the latter. Instead of the three departments, operating fearlessly and honestly, each in its own sphere, and necessarily independent and co-ordinate, according to the original design, as checks upon each other, the executive and legislative would substitute the judicial will for official responsibility, and judicial dicta for the mandates of the Constitution and the sovereignty of the people constitutionally exercised.

June Term
1854.

In re
Booth and
Rycraft.

But without stopping here to inquire, whether for the purposes of this writ the inferior courts of the United States be, or be not inferior to State authority, as regards the office of the writ in a proceeding like this, it can hardly partake of the nature of a writ of error. Every sovereign power has a right to inquire into the condition of its subjects, and the authority or causes of their imprisonment. *Bac. Abr.* 425, *B.* 2; *Cro. Jac.* 453; 3 *Black. Com.* 131; *Mod. Rep.* 198.— This writ is the appropriate means for such inquiry. When the state uses it to inquire whether the citizen is imprisoned by virtue of a power which it has delegated to another government, it does not bring the proceedings of that government under review and attempt to pronounce upon their regularity. It only seeks to ascertain whether the case falls within the scope of any power so delegated, or within its own reserved powers. If within the scope of the former, it yields to the paramount authority which it has helped to vest, if within the scope of the latter, it asserts its own rightful sovereignty therein, and disposes of the subject matter according to its own forms of procedure.

The obligations of the State and Federal governments are herein perceived to be mutual and reciprocal. The one to abstain from all interference, whenever it perceives the subject matter to be within the attached jurisdiction of the other, and that other to show that the authority which it claims to exercise is within the powers delegated, and one which it may rightfully exercise. There is little danger of troublesome collision, so long as each shall be willing to measure its functions by the standard created for the guide of both. But, if to avoid collision, an absolute,

JUNE TERM 1854.

In re Booth and Rycraft.

unquestioning submission on the one hand is requisite, and on the other, a perfect immunity to claim and usurp all powers, and to be the sole and ultimate judge of the extent and validity of its own claims; and to enforce its decisions upon the States, then collision is the preferable alternative, because collision invokes the arbitrament of the people themselves, the ultimate source of political power, whose judgments and decrees are made and pronounced through the peaceful and constitutional modes and means, which they had the wisdom and foresight to provide in the organization of the present system of government "Collisions" of this kind are by no means new in this government. They have occurred from time to time as the supposed exigencies of the country have called into exercise new powers, or have seemed to require the adoption of new measures. They are the rightful and healthful operation of those necessary checks and balances, which are indispensable in a government of divided or distributed powers. But such "collisions" have, all along our history, found their appropriate remedy, in the awakening of inquiry, in a recurrence to primary and fundamental principles, and in a return of the erring to the constitutional sphere. And so will it ever be, until one or another shall repudiate these constitutional checks and balances, and rashly and madly rush on to extremities, in defiance of constitutional obligations and remedies.

The State judges and courts are as much bound to support the Constitution and laws of the United States, as are the federal courts and judges. I cannot yield to the assumption, that the former will be less mindful of their oaths and obligations than the latter; though I can readily perceive why the State

judges may be naturally more mindful of the exact line of demarkation between delegated and reserved powers, because they are under the additional obligation to support the Constitution and rights of the States.*

If these views be correct, how stands the present case ? It is clearly our duty to grant this writ, to enquire into the cause of the prisoner's caption and detention. The return of the respondent sets out the cause. Our next duty is to inquire into the return, in order to ascertain whether the prisoner is held by virtue of any legal authority. It will be conceded that the only rightful authority by which he can be imprisoned must be exercised either by the government of this State, or by that of the United States. No other earthly power can rightfully interfere with his right to liberty. But it is conceded that he is not held by the authority of this State. The next step in the inquiry is to ascertain whether he is held by any constitutional authority of the federal government. Whatever such authority may be, to be of any validity whatever, must clearly appear to be within the powers delegated by the Constitution and laws of the United States made in pursuance thereof. Any other power attempted to be exercised by any department of the federal government would be a

---

* "It is of immense consequence that the States retain as complete authority "as possible over their own citizens. The withdrawing themselves under the "shelter of a foreign jurisdiction, is so subversive of order and so pregnant o "abuse, that it may not be amiss to consider how far a law of *præmunire* should "be revised and modified against all citizens *who attempt to carry their causes be-* "*fore any other than the State courts,* in cases where those other courts have no "right to their cognizance." 4 *Jefferson's Complete Works,* 201.

[Jefferson here, by the term "foreign jurisdiction," has express reference to the federal courts.]

manifest usurpation, and of no binding validity.  The

national convention that framed the Constitution was exceedingly cautious about conferring criminal jurisdiction upon the national government, so much so, that an enumeration of the crimes for which punishment could be provided, was carefully made.  Congress has however provided for the definition and punishment of numerous other crimes and offences, as necessarily incident to the due execution of powers expressly granted.  But all agree that the federal courts can exercise no criminal jurisdiction except in cases specifically prescribed by act of Congress.

Every act of Congress must be conformable to the Constitution, that is, either the exercise of some power expressly granted, or necessary to the execution of some express power.

I have on another occasion attempted to show that the act of Congress, approved September 18th, 1850, commonly called the Fugitive Slave Act, was not within the constitutional power of Congress.  I have no time now to enlarge upon the views there presented.  But I may be permitted to say, that after careful reseach, and much reflection, I have not been able to perceive any reason to recede from the positions then taken, but on the contrary it is clear to my mind, that the contrary doctrine is dangerous to the sovereignty and independence of the States, destructive to the peace and harmony of the Union, and ultimately subversive of the very end and aim contemplated by that enactment.*

*If the doctrines of the Supreme Court of the United States, in the case of *Prigg vs. Pennsylvania*, 16 *Pet. Rep.* 539, are to prevail, the slave States, as well as the free States, are left without the power of protection from incursions of various kinds.  The doctrines of that case are (1) that Congress has the sole and

I cannot discharge my duty without again affirming the conclusions to which I then arrived. I cannot hang my conscience upon the suggestions or opinions dictated by the conscience of others. They must judge and act for themselves. So must I. I must be faithful to my trust as others doubtless are to theirs. But believing as I do that Congress had no power to pass the act of 1850, that the duties and obligations declared by the Constitution in that respect by the 3d clause of sec. 2 of art. 4 of the Constitution, were imposed upon the States, and all power in relation thereto reserved to the States and the people, I am compelled to hold that the act is unconstitutional and void, and can confer no authority upon the federal courts.

This doctrine goes to the jurisdiction of the court which attempted to try and sentence this petitioner, which jurisdiction is always subject to inquiry and decision in any other court in which its proceedings may come in question collaterally or otherwise. This is true of courts of general original jurisdiction, and much more is it true in regard to the jurisdiction of courts of inferior, special and limited jurisdiction.

The second clause of the ninth section of the first article of the Constitution of the United States, pro-

exclusive power to carry into effect the provisions of the third clause of the second section of the fourth article of the Constitution of the United States; and (2) that the States are inhibited from the exercise of any power to legislate in regard to the extradition of fugitive slaves. Now, suppose in the course of the mutations of political power, and the ever-changing aspect of parties, a time should come when the Congress of the United States should refuse to execute that compact from any cause, the States, according to that decision, would be utterly powerless, and those most interested in its faithful observance, would be left without remedy. The folly of reliance upon the power of internal police in the States, is rendered glaringly apparent in the opinion of Chief Justice Taney, and, if possible, still more so, in the case of *Moore vs. Illinois*, (5 *How.* 13.)

vides : " The privileges of the writ of Habeas Corpus shall not be suspended, unless, when in case of rebellion or invasion, the public safety may require it." The insertion of this clause in the Constitution clearly indicates the extreme caution which was exercised by the members of the national convention, and also the apprehension which they felt lest the power of the States might prove too much for that of the federal government. While on the one hand, they obviously intended to leave to the State governments the jurisdiction and control of this high prerogative writ, in all ordinary circumstances, and on all ordinary occasions, on the other, they granted to Congress the power to suspend its privileges whenever there should be manifest an open rebellion against the federal authority, or an invasion of the national or State territory. The suspension of the privileges of the writ here referred to, could not be held as applying only to the power of the United States Courts to issue it, because such power could be made to extend to but few cases, and more palpably, because it could hardly be conceived that the national judiciary would ever be found disposed to use the writ in aid of the subversion of the very authority upon the existence of which their own functions depended. Hence it is apparent that the inhibition and the exception therefrom, have reference to the State functionaries, and the clause must be regarded as restrictive upon the power of Congress to interfere with the authority of the State judges and courts to issue, hear and determine the writ.*

---

* What higher evidence could be desired or found, of the intention of the framers of the Constitution, to invest the respective States and people with the full and absolute control over the writ of Habeas Corpus, except in the particular cases assigned, than is found in the clause of the Constitution above cited. Here

This clause may then be regarded in two aspects, the one as an express reservation to the States of the power and jurisdiction over the writ of Habeas Corpus in all cases whatsoever, except in cases of rebellion or invasion, when the public safety might require its suspension, and in such cases, as an implied grant of power to Congress to suspend its privileges. But these cases must be declared by Congress before any suspension can be ordered. All this goes to show that the framers of the Constitution not only recognized in the States the general absolute control of the writ, but by the provisions cited, absolutely required obedience to it, on all occasions, and by all persons and functionaries, whether State or Federal, unless Congress should delare the existence of the emergencies wherein it might and should suspend its privileges, and to secure the States and people against the exercise of any power, which might possibly override or evade its authority.

In view of this remarkable provision of the Constitution, it is not a little surprising, that a claim is lately set up in behalf of federal officers even of the lowest grade, of entire immunity from any obligation to

---

is an absolute inhibition on the part of the federal government to interfere with the full and free scope of this great writ of freedom; this high prerogative writ, incident to every sovereignty which has not expressly and by the clearest, most indubitable terms relinquished the control of it. And no such relinquishment can be found in the Constitution, either express or implied; but all interference with its benefits by the federal government is expressly inhibited. It is difficult to appreciate the reasoning by which it is attempted to exclude federal process from its purview. All such claims, pretences and pretexts are utterly baseless, repugnant to the organism of our federal system, destructive of the checks and balances which the Constitution has provided, and ought to be firmly repelled by all those who, standing upon the fundamental law as originally enacted, desire to maintain its principles intact, and to prevent the establishment of a federal oligarchy which would reduce the respective States to the condition of mere municipal corporations.

regard the writ when emanating from the State au-

thority, and that jurisdiction of this writ is pertly questioned by inferior ministerial officers, even when issued from the highest judicial tribunal of a sove- reign State. However regardless a people may be of encroachments upon the power to which alone they have confided their liberties, it would seem that such pretensions from such sources, could hardly fail to invite inquiry in regard, not to the rights of sove- reignty originally reserved, but in regard to what yet remain, not yet frittered away by thoughtless ac- quiescence in assumptions of power on the one hand, or voluntary surrender on the other.

But it seems to me unnecessary to pursue this sub- ject further. The whole tenor and scope of the fed- eral Constitution, indicate most clearly that the State judges, and indeed all State offiers, were essential to its maintenance and support, and accordingly the very last clause in the instrument requires such offi- cers to be bound by oath or affirmation to support it. Yet the course of reasoning sometimes resorted to, in order to oust the State judiciary of jurisdiction of a Constitutional question, is based on the assumption that State judges must necessarily be reckless of such obligation, and that fidelity in official duty is only to be expected from federal officers. But this assump- tion goes too far. It is a weapon with a double edge. The same hypothesis presupposes that federal judges are utterly unmindful of the restrictions which the Constitution imposes upon federal power, and that they are willing, for the sake of "*uniformity*," as they say, to administer all power, both State and national. Neither assumption is true. The earnest desire of all,

JUNE TERM 1854.

In re Booth and Rycraft.

or nearly all, is, to ascertain the true line of duty, and to act accordingly.

That errors upon both sides must necessarily be committed, is only admitting that the agencies by which each government is administered, are human. But those who suppose that error upon the one side or the other must necessarily lead to insurrection, revolution and anarchy, have studied the temper of our people and officers to little purpose. Time, reason, reflection, discussion, forbearance, patriotism, will now, as they have done heretofore, prove that the wisdom and intelligence of the parties interested, and especially of the ultimate authority will be found competent for the emergencies which call for their exercise, and equal to the fortune which may put them to the test.

I agree fully with the course of reasoning of my brother Crawford, upon the second branch of this case, viz: that the record of conviction here returned does not show an offence within the jurisdiction of the federal court, even admitting the act of 1850 to be constitutional; and even on that ground alone I should agree to discharge the prisoner. I am permitted and desire to adopt his course of reasoning in that respect, which is so clear and conclusive that further suggestions would be entirely superfluous. I will only say, that whatever the Congress may have designed by the 7th section of the act of 1850, such design can only be discovered from the words of the statute. If they failed to designate the offence as they intended to do, their defect cannot be supplied by any legislation of a judicial tribunal. By their own language must their enactment be con-

strued, and if their intentions may be thwarted in

consequence of a failure accurately to express them, Congress has the same power to amend that it origi- nally had to enact the statute.*

I have deemed it my duty on this occasion to express my views upon a question which I deem vital to the system on which our government is based. The foundation of my action is broader and deeper than the mere purport of the indictment, though that alone would be sufficient for the present occasion.

But the question suggests, and indeed upon the argument have been raised questions involving the powers of the Federal and State governments ; questions not confined to the particular subject matter of the act of 1850, but questions pervading the entire scope of the two governments, in all of their departments, upon other subjects which may from time to time arise. And firmly believing that the beneficent designs of the Union can only be realized, and the Union itself only preserved by maintaining the independence and sovereignty of the States intact, in all

---

*But this indictment does not describe any offence defined by that section. The construction now attempted to be put upon the act of 1850, and which is necessary to sustain this indictment, would authorize the seizure and extradition of any citizen, his wife or child, and make the effort of the brother, husband or father to defend them a crime punishable by fine and imprisonment. Unjust and unconstitutional as that act is, it will not bear such a construction.

This court has no disposition to interfere with the criminal jurisdiction of the District Court of the United States. Unless that court proceeds within the limits which the Constitution and the laws of Congress have prescribed, its acts are a nullity. Its jurisdiction is always open to question, and must affirmatively appear. If jurisdiction be wanting, its process, judgments and decrees are void. Were it otherwise, that court might proceed to indict, convict and punish for common assault, libel, breaches of the peace, &c., imprison our citizens at its own will and pleasure, administer the whole common law code of offences and punishments, from whose judgments there could be no appeal, and whose prison doors no earthly power could unlock. Such doctrine is monstrous. We have not yet reached the point of submission.

respects, except where they have clearly delegated power, and by confining the Federal Government to powers clearly conferred, I have felt called upon to place my views upon our records, in order that I may discharge my full duty, and that my reasons for the decision to which I have been impelled, may be fully known, and not misapprehended.